UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| VICTORIA JEFFORDS, as Administrator of the Estate of DONALD JEFFORDS, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CAUSE NO.: 2:15-CV-55-TLS |
| BP PRODUCTS NORTH AMERICA INC., incorrectly sued as BP CORPORATION NORTH AMERICA, INC., MC INDUSTRIAL, INC., FLUOR CONSTRUCTORS INTERNATIONAL, INC., and LINK-BELT CONSTRUCTION EQUIPMENT COMPANY, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**OPINION AND ORDER**

This matter comes before the Court on several motions. Defendants BP Products North America, Inc.[1] ("BP") [ECF No. 94]; MC Industrial, Inc. ("MCI") [ECF No. 97]; and Link-Belt Construction Equipment Company, L.P., LLLP ("Link-Belt") [ECF No. 103] have moved for summary judgment. Plaintiff Victoria Jeffords has filed a Motion to Strike [ECF No. 107], and Defendant Link-Belt filed an Evidentiary Objections and Motion to Strike [ECF No. 142]. Defendants BP and MCI filed their own Motion to Strike [ECF No. 146], and also joined Link-Belt's Evidentiary Objections and Motion to Strike [ECF No. 151]. These Motions are now fully briefed and ripe for review.

---

[1] As stated in the Notice of Removal [ECF No. 1], BP Products North America, Inc., is the correct name for the first-named defendant.

**BACKGROUND**

The background is taken from the parties' pleadings, motions, and attached exhibits. On December 22, 2014, Donald Jeffords ("Jeffords") filed a Complaint [ECF No. 6] in Lake Circuit Court against BP; MCI; Fluor Constructors International, Inc. ("Fluor"); and Link-Belt. In his Complaint, Jeffords brought two claims. The first stated a negligence claim against BP, MCI, and Fluor. (*See* Compl. ¶¶ 7–11.) The second claim asserted a product liability claim against Link-Belt. In this claim, Jeffords alleged that Link-Belt was negligent in the design, manufacture, and marketing of a crane, the Link-Belt RTC-80110 ("Model 110") which later injured him. (*See id.* at ¶¶ 12–17.) The Complaint also requested damages. (*Id.* at ¶¶ 18–21.) Approximately ten months after filing suit, Jeffords passed away. (ECF No. 54, Suggestion of Death, Ex. A.) Victoria Jeffords was substituted as the Plaintiff as the Administrator of her husband's estate. (*See* Mot. to Substitute Parties, ECF No. 57.) The parties dispute whether the injuries which gave rise to this lawsuit caused Jeffords' passing. (*See, e.g.*, ECF Nos. 107, 108, 143, 147, 155.) Jeffords was not deposed and his testimony was not preserved prior to his passing.

This lawsuit arises from an event on May 4, 2013. On that day, Jeffords fell from the Model 110 at the BP Whiting Refinery. He was performing work at the BP Whiting Refinery as part of a construction project known as the Whiting Refinery Modernization Project. Link-Belt manufactured the Model 110. BP had engaged Fluor to provide engineering, procurement, and construction management services at the site, specifically for all construction activity occurring in the lakefront area near a water treatment facility. This is the area where Jeffords fell from the crane. (*See* BP-Fluor Contract, ECF No. 157-1.) Fluor engaged MCI, on behalf of BP, to provide certain construction services at the site. (*See* Fluor-MCI Contract, ECF No. 157-4.) BP also hired

Central Rent-a-Crane ("Central") to provide crane equipment rental services, operation, and routine maintenance at the BP Whiting Refinery. (*See* BP-Central Contract, ECF No. 157-3.) At all relevant times, Jeffords was employed by Central.

In his Answers to Defendant Fluor's Interrogatories,[2] Jeffords stated that Rick Morales, a co-worker; Mitchell Surovik, another co-worker; Mark Richardson, a foreman; and an unknown electrician from Meade Electric were in the area when he fell from the crane. (Answer to Def. Fluor's Interrog. ¶ 2, ECF No. 104-2.) He further stated that "none of them witnessed [his] fall." (*Id.*) Both Morales and Richardson were deposed, and both testified that they did not see precisely how the incident occurred. (Dep. of Mark Richardson, ECF No. 104-6; Dep. of Ricardo Morales, ECF No. 104-7.) The Plaintiff frames the fall in straightforward terms: Jeffords fell from a catwalk on the Model 110 that was seven feet, one inch off the ground while checking the fluids on the crane before starting work for the day. Jeffords injured his ankles and feet as a result of the fall.

The Plaintiff asserts that Jeffords' fall would have been prevented if the Model 110 had OSHA-required fall protection. The Defendants dispute whether the OSHA regulations apply, and also dispute which Defendant owed Jeffords a duty of care regarding his safety. A photograph of the Model 110 is below.[3]

---

[2] Jeffords passed away before responding to any additional interrogatories or requests for production. (*See, e.g.*, ECF Nos. 104-4, 104-5.)
[3] The photograph was produced as an exhibit during Mark Richardson's deposition. (*See* Richardson Dep. Ex. 1, ECF No. 111-2; *see also* Richardson Dep. 76:18–78:13, ECF No. 161-1.) The Fluor Incident Report produced by the Plaintiff contains two additional photographs of the Model 110. (*See* Fluor Incident Report BP 000460, ECF No. 156-3.) Those photographs contain commentary, and explain that Jeffords was walking on the catwalk along the side of the crane from the back to the front, and that the catwalk narrows as one reaches the front of the crane.



## LEGAL STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The nonmoving party must marshal and present the Court with evidence on which a reasonable jury could rely to find in his favor. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). A court must deny a motion for summary judgment when the nonmoving party presents admissible evidence that creates a genuine issue of material fact. *Luster v. Ill. Dep't of Corrs.*, 652 F.3d 726, 731 (7th Cir. 2011) (citations omitted). A court's role in deciding a motion for summary judgment "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. [A] court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Heochst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Facts that are outcome determinative under the applicable law are material for summary judgment purposes. *Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997). Although a bare contention that an

4

issue of material fact exists is insufficient to create a factual dispute, a court must construe all facts in a light most favorable to the nonmoving party, view all reasonable inferences in that party's favor, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491–92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

**ANALYSIS**

**A. Motions to Strike**

Before the Court addresses the Amended Motions for Summary Judgment, it will dispose of the parties' Motions to Strike. The parties dispute whether certain evidence is admissible through briefing the Motions to Strike. The Court will discuss these motions in turn.

First, the Plaintiff filed a Motion to Strike certain text from the Defendants' Amended Motions for Summary Judgment. (*See* ECF No. 107.) The Plaintiff cited Federal Rule of Civil Procedure 12(f)(2) as the basis for her motion. (*Id.*) A Federal Rule of Civil Procedure 12 motion to strike applies to pleadings. Fed. R. Civ. P. 12(f) ("The court may strike from a *pleading* an insufficient defense or any redundant, immaterial, impertinent, or scandalous material.") (emphasis added). Motions for summary judgment are not pleadings under the Rules. *See* Fed. R. Civ. P. 7(a)(1)–(7) (designating permissible pleadings). As such, proceeding under Rule 12(f) is improper, and the Court will deny the Plaintiff's Motion. That said, the Court has noted the Plaintiff's arguments and will consider them in its summary judgment analysis to the extent that they are pertinent.

Next, Link-Belt filed a 59-page motion [ECF No. 142] objecting to, and asking the Court to strike, in whole or in part, all 91 issues of genuine dispute the Plaintiff identified in her

Response to the Motions for Summary Judgment. BP and MCI joined the motion. The Defendants base this motion on Federal Rule of Civil Procedure 56(c)(2), which states that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). BP and MCI also filed their own motion under Rule 56(e). (*See* ECF No. 146.) BP and MCI's 18-page motion centers on specific evidence offered by the Plaintiff to defeat summary judgment.

Because the Court is able to distinguish which exhibits, affidavits, statements, and commentary may properly be considered when deciding whether summary judgment is appropriate, the Court denies the Defendants' Motions. The Court has noted the Defendants' objections and will consider them in its summary judgment analysis. The Court now turns its analysis first to the Plaintiff's negligence claim against BP and MCI, and then to the Plaintiff's product liability claim against Link-Belt.

B.    **Negligence Claims Against BP and MCI**

Because the Court is exercising diversity jurisdiction over this case, Indiana substantive law applies. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). A plaintiff must satisfy three elements for a negligence claim under Indiana law: (1) that a defendant owed a duty to the Plaintiff; (2) that the defendant breached the duty by allowing its conduct to fall below the applicable standard of care; and (3) a compensable injury was proximately caused by the defendant's breach. *Ryan v. TCI Architects/Eng'rs/Contractor, Inc.*, 72 N.E.3d 908, 913 (Ind. 2017) (citing *Goodwin v. Yeakle's Sports Bar & Grill, Inc.*, 62 N.E.3d 384, 386 (Ind. 2016)). Here, the Plaintiff argues that both BP and MCI breached a duty of care owed to Jeffords

because Jeffords fell from a catwalk on a crane at the worksite that was only thirteen-inches wide and seven-feet, one-inch above ground but lacked a protected edge or handrail in violation of OSHA regulations. As a result, Jeffords was injured. Both BP and MCI assert that they did not owe Jeffords a duty of care that would encompass his activities on the crane.

**1.** *Landowner Duty of Care*

In its Amended Motion for Summary Judgment, BP first asserts that it did not owe Jeffords a duty of care as a landowner. Under Indiana law, landowners do not owe a duty to provide a safe work environment to the employees of independent contractors, and instead are only obligated to maintain the property in a reasonably safe condition. *Pelak v. Ind. Indus. Servs.*, 831 N.E.2d 765, 769 (Ind. Ct. App. 2005). This obligation does not extend to equipment on the land that is under the exclusive control of another party. *See Daisy v. Roach*, 811 N.E.2d 862, 866–67 (Ind. Ct. App. 2004) (holding that a landowner did not breach a duty of care when a subcontractor's employee fell from a ladder that was under the subcontractor's exclusive control at a worksite). In this case, the Plaintiff argues that BP breached a duty of care to Jeffords when Jeffords fell from a crane on BP's property. But Jeffords was employed by an independent contractor, Central, at the time of his fall, and the Plaintiff has not presented evidence to show that BP utilized any control over the crane at the time of the fall. In fact, the Plaintiff did not address BP's argument concerning the duties owed by a landowner in her Response. Therefore, BP cannot be liable based on any duty it owed to Jeffords as a landowner—its only role during the events at issue in this case.

## 2. *Contractual Duty of Care*

In her Response, the Plaintiff asserts that BP and MCI owed Jeffords contractual duties of care. "Whether a duty exists is a question of law for the court to decide[,]" and "[a]bsent duty, there can be no negligence." *Ryan*, 72 N.E.2d at 913 (citations omitted). In Indiana, a general contractor is, generally, not liable for the negligence of its independent subcontractors. *Id.* (citing *Bagley v. Insight Communications Co.*, 658 N.E.2d 584, 586 (Ind. 1995)). Additionally, as stated previously, landowners generally do not owe a duty to the employees of its subcontractors. *See Bateman v. Central Foundry Div., Gen. Motors Corp.*, 822 F. Supp. 556, 563 (S.D. Ind. 1992) ("[A] landowner has no duty to furnish an independent contractor's employees with a safe place to work; rather, he has a duty 'to keep his property in a reasonably safe condition, coextensive with the purpose and intent of the implied invitation.'") But a duty of care may arise contractually, and "[w]here the contract affirmatively evinces an intent on the part of the parties to charge one party with a duty of care, actionable negligence may be predicated upon the contractual duty." *Plan-Tec, Inc. v. Wiggins*, 443 N.E.2d 1212, 1218 (Ind. Ct. App. 1983). While the Plaintiff argues that BP and MCI assumed non-delegable duties through contracts, the Court disagrees.

### a. *BP*

The Plaintiff asserts that in this case BP acted as a general contractor or construction manager,[4] rather than a disinterested landowner. For example, the Plaintiff argues that, through its contracts, BP retained control over safety methods and integrity management procedures, required compliance with the BP Manual of Safety Procedures and certain risk management and

---

[4] Fluor, the construction manager at the site where Jeffords was injured, has not moved for summary judgment.

hazard evaluation procedures, and was on-site daily to monitor compliance. Therefore, according to the Plaintiff, BP assumed contractual duties for Jeffords' safety under Indiana law. *See Ryan*, 72 N.E.3d 908 (explaining contractual duties of care for general contractors); *see also Hunt Constr. Grp v. Garrett*, 964 N.E.2d 222 (Ind. 2012) (explaining contractual duties of care for construction managers). But while these cases do hold that general contractors and construction managers *can* owe duties to the employees of their independent contractors, the cases do not hold that general contractors and construction managers *always* owe duties to the employees of their independent contractors. For example, a construction manager, absent contractual provisions to the contrary, does not assume a duty of care for the safety of its independent contractors' employees when the construction manager inspects a site daily for violations of a project safety program, compiles safety reports that suggest corrective action should be taken, conducts weekly safety meetings that independent contractors are required to attend, and requires an independent contractor to initiate disciplinary procedures when safety programs and policies are violated. *Hunt*, 964 N.E.2d at 230–31. In *Hunt*, the Indiana Supreme Court examined the provisions of the contracts at issue and found that:

> [N]one of the safety provisions in the construction-management contract here impose upon Hunt [the construction manager] any specific legal duty to or responsibility for the safety of all employees at the construction site. There is no language like that used in *Moore* [*v. Shawmut Woodworking & Supply, Inc.*], 788 F. Supp. 2d [821,] 825 [(S.D. Ind. 2011)] ("The Contractor shall take reasonable precautions for safety of . . . employees on the Work"); in *Stumpf* [*v. Hagerman Const. Co.*], 863 N.E.2d [871,] 877 [(Ind. Ct. App. 2007)] ("The Contractor shall take all necessary precautions for the safety of employees on the work"); or in *Harris* [*v. Kettelhut Const., Inc.*], 468 N.E.2d [1069,] 1072 [(Ind. Ct. App. 1984)] ("The Contractor shall take all necessary precautions for the safety of all employees on the Project"). To the contrary, . . . other provisions unequivocally support the opposite conclusion.

*Id.* at 227. The Supreme Court of Indiana concluded that "Hunt [the construction manager] did not undertake in its contracts a duty to act as the insurer of safety for everyone on the project." *Id.* at 228.

In this case, the contract between BP and Central specifically delegated to Central the responsibility for ensuring that the work would be safely performed. (BP-Central Contract BP000009, 000036, 000064, 000067, ECF No. 157-3.) Similarly to the construction manager in *Hunt*, BP representatives required subcontractors to follow its safety program and applicable laws, and had representatives inspect the site. Under *Hunt*, this is insufficient to impose a duty of care on BP. Further, the Indiana Supreme Court also held in *Hunt* that a construction manager could assume a duty of care if the construction manager "undert[ook] specific supervisory responsibilities beyond those set forth in the original construction documents." *Hunt*, 964 N.E.2d at 230. In this case, the Plaintiff has not presented evidence that demonstrates that BP performed more obligations than those required under the contract, and therefore has not established that BP assumed a conduct-based duty of care.

The Plaintiff's theory based on *Ryan* is similarly flawed. The decision is *Ryan* was based solely on the language of the contract involved. *Ryan*, 72 N.E.3d at 916 ("We reiterate that our decision today is solely guided by our contract interpretation precedent.") The language in that contract plainly provided that the general contractor assumed worksite safety responsibilities. *See id.* at 915. The Supreme Court of Indiana noted that:

> Th[e] language, taken as a whole, makes clear that TCI [the general contractor] intended to assume the duty of keeping the worksite reasonably safe. First, the language quoted above is found in subparagraph 2.8, whose heading is aptly entitled: "Design-Builder's Responsibility for Project Safety." . . . Beyond the explicit assumption of responsibility for safety, the contract also bestowed upon [the general contractor] a level of control that satisfies our concerns over imputing liability on a general contractor who enjoys no control over the means and manner of completing the work. In the contract, [the general contractor] explicitly agreed

> that it "shall at all times exercise complete and exclusive control over the means, methods, sequences and techniques of construction."

*Id.* The contract between BP and Central lacks such explicit language, and also contains provisions emphasizing that Central is an independent contractor who has full control and direction of the detail, manner, means, and methods of performing the work. (BP-Central Contract at BP000008, BP00009–10, BP000064.) The contract between BP and Central demonstrates that the parties did not intend for BP to assume a duty to Central's employees, including Jeffords. Therefore, as a matter of law, BP is not liable for negligence based on any purported contractual or conduct-based duty between BP and Central.

For similar reasons, the contract between BP and Fluor does not establish that BP owed a contractual duty of care to Jeffords. In fact, that contract language provides that Fluor assumed responsibility for the safety for "its personnel and the personnel of others[.]" (BP-Fluor Contract BP000166–67, ECF No. 157-1.) The BP-Fluor contract also provides that Fluor is required to follow certain safety procedures, allows certain BP employees access to the site, provides that Fluor can procure certain material and equipment for use on the site, and limits which subcontractors Fluor may hire. (*Id.* at BP000161–62, BP000162–63, BP000165–67.) The Indiana Supreme Court has found that contracts like this, where a party retains measures to require certain safety standards on a construction project but explicitly provides that another party bears responsibility for safety, do not impose a general duty of care for safety on both parties. *See Hunt*, 964 N.E.2d at 230–31. In this case, the contract between Fluor and BP establishes that the parties did not intend for BP to assume of a duty of care to the employees of Fluor and other subcontractors. Additionally, the Plaintiff again has not presented evidence that demonstrates that BP performed obligations beyond those required under the contract. Therefore, as a matter

11

of law, BP is not liable for negligence based on any purported contractual or conduct-based duty arising from the BP and Fluor contract.

b.  *MCI*

The Plaintiff asserts that MCI assumed a contractual duty of care to Jeffords as well. This theory is, like the theory concerning the duties owed by BP, based on *Hunt* and *Ryan*. As such, the Court applies the same analysis and examines the contract between MCI and Fluor. The contract includes provisions related to, among other things, health and safety, inspection, compliance with laws, and MCI's independent contractor status. (Fluor-MCI Contract MCI000025–28, 000044–45, 000047, ECF No. 157-4.) These provisions contain language which reflect that the parties intended for MCI to be responsible for the safety of its own employees and, in certain circumstances, the employees of MCI subcontractors. (*See id.*) But the contract does not contain broad language to suggest that the parties intended for MCI to be responsible for the safety of *all* workers on site. Additionally, Central was not a subcontractor of MCI, and Jeffords was not an employee of MCI at the time of the accident. Under its contract, MCI did not owe a duty to the employees of Central, and therefore did not owe a contractual duty to Jeffords. Additionally, the Plaintiff again has not presented evidence that demonstrates that MCI performed obligations beyond those required under the contract. Therefore, as a matter of law, MCI is not liable for negligence based on any purported contractual duty based on the contract between MCI and Fluor.

**2.**   *Vicarious Liability*

   The Plaintiff also presents broad, but underdeveloped, theories of vicarious liability in her Response. The theories are summarized as follows:

   - BP is vicariously liable for any breach of duty by Fluor, since Fluor acted as an agent of BP;

   - BP is also vicariously liable for any breach of duty by MCI, due to BP's direct contract with MCI, BP's control over MCI, and the contract between MCI and Fluor (as BP's agent);

   - BP is liable for any breach of duty by Central, the Plaintiff's employer, due to its contract with Central;

   - BP is also liable for any breach of duty by Central due to its control over Central;

   - BP is vicariously liable for *any* contractor's breach of duty due to its control over the Whitley Refinery Modernization Project because BP required all contractors to comply with its proprietary safety procedures and standards, retained control over safety evaluation and risk management, and basically retained safety control of all people on the site; and

   - BP, Fluor, and MCI assumed a non-delegable duty of safety to all employees on the construction project on the lakefront through their actions and conduct in practice and the site.

(Pl. Resp. 8–10, ECF No. 110.) While the Plaintiff phrases these arguments in terms of vicarious liability, the arguments are the same as those put forth under *Hunt* and *Ryan*: BP, Fluor, or MCI assumed a duty of care to the Plaintiff through either (1) contract or (2) conduct. As described above, the contracts presented for the Court's consideration did not establish a contractual duty

13

of care for BP or MCI concerning Jeffords' safety. Indeed, the Court notes that the contract between BP and Fluor placed the onus on Fluor to provide and ensure for the safety of employees of Fluor and other contractors and subcontractors. (BP-Fluor Contract BP000166–67, ECF No. 157-1.) Further, as stated in *Hunt*, in the construction context, conduct can only establish a duty of care where a party assumes greater responsibility than that provided for in the contract. The Plaintiff has not presented evidence showing that BP or MCI performed more than any contractually required obligations, which is insufficient under Indiana law to establish a conduct-based duty claim in the construction context.

**C.      Product Liability Claim Against Link-Belt**

The vast majority of the evidence provided by the Plaintiff, including deposition testimony and her expert's report, focuses primarily on the duties of care allegedly owed by BP, MCI, and Fluor, and the applicability of certain OSHA regulations. As to her product liability claim against Link-Belt, the Plaintiff asserts that the Model 110 should have had fall protection to prevent falls from a height greater than six feet. (Pl. Resp. 10.)

The Indiana Product Liability Act (IPLA) governs all actions brought by a user or consumer against a manufacturer for physical harm caused by a product. *Piltch v. Ford Motor Co.*, 778 F.3d 628, 632 (7th Cir. 2015) (discussing the IPLA). The Plaintiff must satisfy several elements to prevail on a claim under the IPLA, including that:

> (1) he or she was harmed by a product; (2) the product was sold "in a defective condition unreasonably dangerous to any user or consumer"; (3) the plaintiff was a foreseeable user or consumer; (4) the defendant was in the business of selling the product; and (5) the product reached the consumer or user in the condition it was sold.

*Id.* (quoting *Bourne v. Marty Gilman, Inc.*, 452 F.3d 632, 635 (7th Cir. 2006)). The second element can be satisfied "by showing a design defect, a manufacturing defect, or a failure to warn." *Id.* (citing *Hathaway v. Cintas Corp. Serv., Inc.*, 903 F. Supp. 2d 669, 673 (N.D. Ind. 2012)). The Plaintiff's Complaint—alleging that the Model 110 was negligently designed and manufactured and "constituted a breach of implied warranty of merchantability"—and her Response—arguing that Link-Belt manufactured the crane without fall protection above six feet and it reached an intended user, Jeffords, in this condition—sound in either a manufacturing defect claim or a design defect claim. The Court now turns its analysis to these two product liability theories.

1.  *Manufacturing Defect*

"A product contains a manufacturing defect when it deviates from its intended design." *Westchester Fire Ins. Co. v. Am. Wood Fibers, Inc.*, No. 2:03–CV–178, 2006 WL 3147710, at *5 (N.D. Ind. Oct. 31, 2006); *see also* Restatement (Third) of Torts: Products Liability § 2 (1998) (a manufacturing defect occurs "when the product departs from its intended design even though all possible care was exercised in the preparation and marketing of the product[.]") In this case, the Plaintiff has not presented any evidence that the Model 110 at issue deviated from Link-Belt's intended design or differed in any way from a normally manufactured Model 110. The Plaintiff has not argued, for example, that a standard Model 110 contains a railing on its driver side catwalk, but this one did not. Instead, the Plaintiff asserts that the Model 110 should have had some form of fall protection. Such a claim is properly considered a design defect claim. *See Hathaway*, 903 F. Supp. 2d at 674 (explaining that product liability theories based on alternative designs are design defect claims rather than manufacturing defect claims) (citing *Westchester*

15

*Fire Ins. Co.*, 2006 WL 3147710, at *5). Accordingly, the Court turns its analysis to the alleged design defect.

**2.    *Design Defect***

"[I]n product liability claims alleging a product design defect, the Indiana Product Liability Act substitutes a negligence standard for strict liability and prescribes the applicable standard of care." *TRW Vehicle Safety Sys., Inc. v. Moore*, 936 N.E.2d 201, 214 (Ind. 2010) (citing Ind. Code § 34-20-2-2). The Plaintiff "must establish that the manufacturer or seller failed to exercise reasonable care under the circumstances in designing the product or in providing the warnings or instructions." Ind. Code § 34-20-2-2. There is an additional requirement: "Indiana requires the plaintiff to show that another design not only could have prevented the injury but also was cost-effective under general negligence principles." *Whitted v. Gen. Motors Corp.*, 58 F.3d 1200, 1206 (1995) (quoting *Pries v. Honda Motor Co.*, 31 F.3d 543, 546 (7th Cir. 1994) (applying Indiana law and holding that expert testimony is required in design defect product liability actions)).

Here, the Plaintiff presented no expert testimony on alternative designs for the Model 110 with the desired fall protection. In this design defect scenario, a jury must compare costs and benefits between the Model 110 and a crane with the Plaintiff's alternative designs. Such testimony would allow the jury to ultimately decide whether Link-Belt was negligent in failing to adopt a cost-efficient alternative design that increased the safety of potential end users of its product. *See Piltch*, 778 F.3d at 632 ("Without expert testimony, a lay jury would be unable to compare the costs and benefits of supposed alternative air bag designs with the Mountaineer's actual air bag design.") Here, without expert testimony, a lay jury cannot make this

16

determination. Therefore, the Plaintiff has not presented sufficient evidence to maintain its product liability claim on a design defect theory.

Therefore, on the present record, the Plaintiff has failed to establish a prima facie product liability claim, and Link-Belt is also entitled to judgment as a matter of law.

## CONCLUSION

For these reasons, the Court DENIES Plaintiff Victoria Jeffords' Motion to Strike [ECF No. 107], Defendant Link-Belt's Motion to Strike [ECF No. 142], and the Motion to Strike filed by Defendants BP and MCI [ECF No. 146]. The Court GRANTS the Amended Motions for Summary Judgment filed by Defendants BP [ECF No. 94], MCI [ECF No. 97], and Link-Belt [ECF No. 103].

All claims against Fluor Constructors International, Inc., remain pending.

SO ORDERED on August 10, 2018.

s/ Theresa L. Springmann<br>
CHIEF JUDGE THERESA L. SPRINGMANN<br>
UNITED STATES DISTRICT COURT<br>
FORT WAYNE DIVISION